

**ROBERT A. GORDON**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| Carol Todd | * | Case No. 09-32262-RAG |
| | | Chapter 7 |
| Debtor | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| Carol Todd | * | |
| Plaintiff | * | |
| v. | * | Adversary No. 10-00091-RAG |
| Access Group, Inc., *et al.* | * | |
| Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION IN SUPPORT OF
## JUDGMENT DISCHARGING STUDENT LOANS

**I.   Introduction**

*"I don't live a regular life."* – The Debtor, Carol Todd

*"If you are trying to find out if there are things that Ms. Todd cannot do, if that is your question…then I can tell you for one thing I don't expect Ms. Todd to be able to work and pursue a job, pursue a profession and pursue financial income through employment as we customarily know what employment is. She's not able to do that."*
– Dr. Ramana Gopalan, Carol Todd's Primary Care Physician

*"Curiouser and curiouser."* –Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking-Glass* 11 (Puffin Books 1998) (1865).

11 U.S.C. § 523(a)(8) expressly permits the discharge of a student loan if excepting the loan from a debtor's discharge would cause the debtor an 'undue hardship'.[1] Webster's Third International Dictionary defines 'undue' as being, "unsuited to the time, place or occasion," and "exceeding or violating propriety or fitness." *Webster's Third New International Dictionary, Unabridged*, 2492 (3rd ed., 2002). 'Hardship' is defined as, "something that causes or entails suffering or privation." *Id.* at 1033. These definitions do not suggest an infinitely elusive standard, an objective that — like Sisyphus's task — no debtor can ever meet. Such an interpretation would result in the erasure of the statute's words and defy plain Congressional intent in the bargain. Stated another way, and notwithstanding the heightened level of scrutiny emphasized in the case law, it must be possible for some combination of factors to exist that justify the discharge of a student loan.  After considering the virtually undisputed facts of this case regarding Ms. Todd's peculiar set of circumstances this Court concludes that it would cause suffering or privation unsuited to the time and occasion for her to depart bankruptcy with continuing liability for these student loans in light of the statutory mandate and therefore an order declining to except them from her discharge — and thus discharging them — will be entered. The reasons underlying that conclusion are as follows.

---

[1] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United States Code.

## II. **Procedural History**

On November 16, 2009 (Petition Date), Carol Todd (Ms. Todd or Debtor) filed her

Voluntary Petition for Relief under Chapter 7 of the Code.   On February 15, 2010, Ms. Todd

commenced this Adversary Proceeding by filing her Complaint to Determine Dischargeability of

Student Loans.[2]  Creditors Access Group Inc. (AGI), Educational Credit Management

Corporation (ECMC) and the U.S. Department of Education (DOE) (collectively the Defendants)

all answered[3] and objected to Ms. Todd's attempted inclusion of their student loan debt ─

alleged in the Complaint to be in excess of $320,000 ─ within her discharge. [4]  Trial was held on

November 22, 2010 and following post-trial submissions, a final hearing to entertain argument

occurred on April 2, 2011.[5]  Ms. Todd's other debts were all discharged by Order entered on

June 25, 2010.

---

[2] A First Amended Complaint to Determine Dischargeability of Student Loans (Complaint) was filed on June 28, 2010 (Dkt. No. 29). The Debtor's case was presented at trial on the basis of that pleading.

[3] AGI filed a Motion to Dismiss (Dkt. No. 14) that was denied after a hearing held on June 14, 2010.

[4] The Complaint listed the approximate amount of the total debt as $323,810.00.  Prior to trial, the parties stipulated that the Debtor owed $125,581.25 to AGI and $80,867.66 to the DOE. ECMC submitted internal records as exhibits that showed $132,912.77 owed in student loans as of November 2010.  Ms. Todd did not dispute that amount and hence, at trial, it was settled that at least $339,361.68 in student loan debt was owed by her to the Defendants.  Ms. Todd also averred in the Complaint that she owed $7,700 to ACS/US Bank NA Brazos, $465 to AMS-SG/UBaltimore and $1513 to Compptnrs/Villa Julie and likewise named those entities as defendants.  However, they were never properly served pursuant to Bankruptcy Rule 7004.  Therefore, they were not joined as parties and the debts they are owed were not at issue at trial.

[5] The Court apologizes to the parties for the length of time it has taken to complete this Memorandum Opinion.  An untoward combination of circumstances in Chambers prevented its completion until now.

### III. Factual Background

    *A.  Carol Todd*

       *a.  Ms. Todd's Autism and Other Serious Ailments*

Since early childhood, Carol Todd has had an autism spectrum disorder (Autism).  At the time of trial, she was 63 years old with no dependents.  Her attorney asked her to describe how Autism affects her daily life.[6] She said:

> I'll try, if you give me a moment. It's a spectrum and it changes over time and it changes situationally.
>
>     *               \*               \**
>
> I can't stand loud noises, so if I'm out somewhere and a little child screams, I just go like that because I can't stand loud noises. And I can't stand a lot of – it's a sensory integration problem in part, so I can't take a lot of sensory input for any long periods of time.
>
> It's a neurological disorder that connects with the gut (sic).[7] That's what autism is. It's not a mental disorder, although it is in the diagnostic statistical manual, but I'll just describe my experience.
>
> So I can't take a lot of stimulus at all so I try to stay very quiet…. I like things to be very routine. When my routine's upset, it kind of throws me and it takes me a little while to recover, but I do recover and so I like patterns and then, for example, just going to school I couldn't sit. I always sit next to the door so I could get up and go up and down the hall. Two back-to-back classes, hour-fifty-minute classes would have been impossible for me because it was just too intense so I need to stay quiet.

---

[6] The Court offers a heartfelt commendation to Ms. Todd's attorney Frank Turney, Esquire. Mr. Turney represented Ms. Todd *pro bono* and did an exemplary job under very trying circumstances. Mr. Turney's conduct in taking this case to trial exemplifies those special, praise-worthy qualities held by the very best of the Honorable Profession.

[7] Ms. Todd testified at length that she suffered from "leaky gut syndrome" and specified in some detail the Internet-sourced, self-prescribed treatments that she takes as a remedy.  However, during his deposition Dr. Ramana Gopalan, Ms. Todd's long time internist, discounted leaky gut syndrome as a legitimate illness.  (Gopalan Dep., 16-17.)  Accordingly, the Court does not assume the accuracy of Ms. Todd's characterization of Autism as connecting with the 'gut'.

(Trial Tr., 18-19, Nov. 22, 2010.)

Dr. Gopalan described during his deposition how Ms. Todd's Autism – he called it

Asperger's syndrome – presents:[8]

> Other manifestations are aside from being solely in isolation, she can't focus on other tasks. She may have relative tasks that she performs several times during the day which tends to direct her attention and resources away from other things which she might be doing more productive for her life, but she tends to focus on these certain topics and spends a great amount of time and energy on these topics throughout the day.
>
> Q – As a doctor, how do you treat Asperger's?
> A – You can't treat it.
> Q – No medications?
> A – There's no medication.
>
> *            *            *

Dr. Gopalan then described how Asperger's syndrome nullifies Ms. Todd's ability to

work productively at a normal job:

> A person with intellectual disability may be able to bus tables at McDonald's but after 10 minutes the person may walk out the door and do something else unless the supervisor standing there telling them you can't go outside to look at the birds, you need to bus the tables and this is how you do it.
>
> So a person with Asperger's syndrome cannot focus on a task and execute an eight hour day of something productive in order to be paid for doing it or producing something that is of less importance to an employer.

(Gopalan Dep., 16, 23.)[9]

---

[8] Ms. Todd does not believe that her ailment should be characterized as Asperger's syndrome.

[9] Dr. Gopalan acknowledged that he is not an 'expert' on Asperger's syndrome.  However, from 1995 to 1999 and from 2007 to the time of the trial he served as Ms. Todd's primary care physician.  He is, therefore, uniquely qualified to give an opinion as to Autism's effects on her.

Ms. Todd was the trial's only live witness. The Court observed her closely. She was articulate and intelligent. If one were to read select portions of the transcript without having watched the trial, one might be fooled into thinking that she can function normally. However, that conclusion would be a gross misperception. It quickly became evident, from the vantage point of the bench, that Ms. Todd's reality is very different from the norm.  Autism tunnels her perception to a very fine point and that is reflected by her eerie disconnectedness from a comprehensive life experience. As a matter of behavior, there were several times during her testimony when Ms. Todd became overwhelmed in the face of seemingly innocuous questions and for no apparent reason folded into a fearful shell.  None of this was contrived; instead, it all found its source in Ms. Todd's incurable ailment.

Her daily existence, described during her deposition, also bears this out. In sum, it consists of breakfast followed by a regime of pills, surfing the Internet, prayer for several hours, eating every two hours, and contacting churches and Autism related organizations with the largely quixotic goal of finding work or, perhaps more likely, charity. The hallmark is isolation. Ms. Todd described it this way:

> I always try to get somebody on the phone. I always try to rationalize to myself giving – convincing myself that I have a good excuse to call somebody like, you know, I could think of anyone because I want to hear a human voice in person acknowledging that I'm alive.
> Q – You mean a friend or relative?
> A – I don't have any of those.
> Q – No friends of relatives?
> A – No, my friends are customer service reps, they're the relationships that I build these days.
> Q – Do you leave the condomium?
> A – No. Take out the trash. That's about it.
>
> *           *           *

Q – You mentioned earlier when we were talking here that you spend about, you know, maybe 13 to 15 hours consecutively on the phone –

A – That's correct.

Q – and Internet?

\*   \*   \*

I'll be led from one to another to another and then I'll just sort of get a picture of this organization…And then I would – if it's a local church, for example, see if they had any social justice statements on their website. Find out pastors names and call and basically tell them a very brief account of my story about moving back to Maryland. And, you know, just in desperate financial straights. And, you know, need help and then asking for work, you know, offering to do their gardening, their landscaping or cleaning their church or anything to get money to my landlord. And then as I'm doing that, sometimes I'm online to the next call. And so I just keep, you know, I don't put down the phone. It's one after another after another.

\*   \*   \*

Q – And how often would you do this in, say, a given week or a given month?

A – Constantly. Fifteen hours a day I was putting in.

\*   \*   \*

Q – This routine, the 13 to 15 hours on the phone and internet, is it fair to say you would do it for the majority of the days of the week?

A – Five days. And then on the weekends if there was any expectation of reaching anyone then I would certainly try it on the weekends. But I didn't have break time where I spent resting one day a week. I was constantly going and couldn't stop because of this fear that would overwhelm me, you know, just looking into dying a horrible, terrifying death on the street.

(Todd Dep., 33-37.)

The Court concludes that to expect Ms. Todd to ever break the grip of Autism and meaningfully channel her energies toward tasks that are not in some way either dictated, or circumscribed, by the demands of her disorder would be to dream the impossible dream.  In the

end this observer was thoroughly convinced that for Ms. Todd, Autism – or Asperger's – is a permanent condition that will not permit her to function 'normally' in almost any sense of the word.  Because of Autism Ms. Todd has not been able, for the vast majority of her life, to gain or hold a job, let alone fashion a career, and there is no chance that state of affairs will ever change.

Ms. Todd also suffers from Post Traumatic Stress Disorder (PTSD) (the likely result of a kick to the head by a horse, and a resulting subdural hematoma, when Ms. Todd was much younger) and osteoporosis.  Per Doctor Gopalan, PTSD "includes many manifestations that I have mentioned here which include cognitive impairment, deficits in memory, difficulty in processing information." (Gopalan Dep., 35.) Osteoporosis, on the other hand, results in chronic pain syndrome.  Dr. Gopalan testified that Ms. Todd "cannot perform functions such as lifting, carrying, handling objects, pushing, pulling, fine manipulations. All of these are markedly restricted." (Gopalan Dep., 27.) Ms. Todd takes a variety of medications and supplements to manage her PTSD and the pain and discomfort of her osteoporosis.  All told, her Autism and other ailments serve ─ like a metaphysical prison cell ─ to limit and restrict her lifestyle in a thoroughly potent way.

### b.  Ms. Todd's Monthly Income and Expenses

At the time of trial, Ms. Todd was living alone in a two bedroom apartment in a Baltimore suburb.[10]  She described several times her landlord's efforts to evict her and her counter-efforts to raise rent money. Her meager financial circumstances underscore this dark circle; it is the government's safety net that alone keeps her from tumbling into the abyss.  Her

---

[10] One bedroom was used as an office.

total income each month consists of $768.00 in Social Security Disability Income (SSDI) payments.[11] Those payments are supplemented by a monthly food stamp allotment of $200.

Her average monthly expenses of $1,906.00 are itemized as follows:

| | | |
|---|---|---|
| a. | Rent | $1,050.00 |
| b. | Utilities | $60.00 |
| c. | Home maintenance | $5.00 |
| d. | Telephone | $49.00 |
| e. | Car insurance | $49.00 |
| f. | Medical | $229.00 |
| g. | Entertainment/recreation | $4.00 |
| h. | Laundry | $5.00 |
| i. | Transportation | $30.00 |
| j. | Groceries | $425.00[12] |

As is made obvious by the numbers, her monthly deficit is over $900. The legal significance of that fact will be discussed further, *infra*. However, for present purposes it is fair to summarize the evidence regarding Ms. Todd's finances by acknowledging that her lifestyle is about as frugal and plain as can be without either living in a homeless shelter ─ or under a bridge ─ and is in keeping with her poverty level of subsistence.

       *c.   Ms. Todd's Educational History*

Ms. Todd did not attend school as a child or young adult. Instead, she received her GED at the age of thirty-nine. Thereafter, she attended several institutions of higher learning and the

---

[11] Ms. Todd testified that she received standard Social Security Income and then at some point it converted to SSDI.
[12] Ms. Todd's Bankruptcy Schedules 'I' and 'J', signed under penalty of perjury, generally confirmed her testimony regarding her income and expenses.

student loans in question paid for her post-GED educational experiences. Ms. Todd's testimony gives a context for those experiences and the reasons why, at that age, and notwithstanding her Autism, the decision was made for her to pursue higher education.

By her account, higher education was at the core of her DOE-conceived rehabilitation program: scholarship was pursued as a stepping stone toward a measure of liberation from Autism and perhaps to help her achieve something closer to a normal life. As she stated,

> I followed advice that I was given by rehabilitation specialists and went in – that paid for my education and went into Villa Julie College the day after I think I got my GED.  And I think I was really dumb, but I did extremely well and then I got – I won a full scholarship to law school, an accelerated program; and then left that and went to the College of Notre Dame – … and then got a Bachelor's Degree; and then went to Towson University.
>
> *I didn't exactly earn my degrees*, *they were negotiated for me* by the US Department of Education Office for Civil Rights, who repeatedly came in and said that –
> [Objection sustained]
>
>    *     \*     \*
>
> *My experience is that I could not graduate on my own and I had to rely on the US Department of Education Office for Civil Rights going to the school and to inform [sic] that I was a member of a protected class and had to have academic adjustments under Section 504, the Rehabilitation Act of 1973.*[13]
>
>    \*     \*     \*
>
> It was my understanding that I needed to sign all these papers [loan documents], and there were a lot of them, to continue with my rehabilitation program rather than initially thinking of them as loans I was responsible for.
>
>    \*     \*     \*

---

[13] The Court concludes that the fact that Ms. Todd's degrees were 'negotiated' for her has great bearing upon the legal analysis set forth in Section V, *infra*.  In short, this rebuts in large measure the Defendants' contention that Ms. Todd's 'success' in academia can be used as a positive predictor of her ability to hold down a job.

> I believed it was known that people with disabilities had a valuable contribution to make and there was a lot of pressure to get off of disabilities and – meaning Social Security disability income and get into the work force.  So my rehabilitation program was to help me do that.

(Trial Tr., 14-16, 24, Nov. 22, 2010.) (Parentheses and italics added.)

Ms. Todd attended Villa Julie College from 1989 to 1992 where she began a course of paralegal studies before switching to general studies and ultimately obtained an Associate of Arts Degree.  In 1992, she became a student at the University of Baltimore School of Law on a full scholarship through an 'accelerated' program. However, she did not complete the program and did not receive a degree.  From 1992 to 1996, she completed a Bachelor's Degree in Philosophy at the College of Notre Dame.  From 1996 to 1997, she attended Towson University and obtained a Master of Arts with a concentration in business.  From 1997 to 1999, also at Towson University, she studied for and obtained a Master of Science Degree.  From 2001 to 2007, Ms. Todd attended Regent University (Regent) for a doctoral program but did not obtain a degree from this institution.  Finally, in 2007, Ms. Todd obtained a "Ph.D." from an unaccredited online school at a cost of $1,000.

In order to complete her education, Ms. Todd received various accommodations from the universities she attended.  For example, Dr. Gopalan wrote in an April 7, 1995 letter that Ms. Todd's curriculum needed to be presented in a structured manner through Ms. Todd's independent advisor.  Likewise, in a May 9, 1997 letter, Dr. Gopalan stated that Ms. Todd has difficulty processing information and, "may require an extended period of time to complete even relatively straight forward assignments." (Gopalan Dep., Exhibit 1.) Ms. Todd also referred to accommodations garnered by DOE ─ in addition to interventions pursued to 'negotiate' degrees

— on her behalf and readily admits that she would not have been able to progress through her course of study without DOE's steadfastness.[14]

As Ms. Todd explained it, she continued her academic odyssey, and the government-sponsored rehabilitation program, for almost twenty years in part because each time she obtained a degree she found herself still unable to obtain employment that would allow her to earn a living, support herself and, moreover, repay the student loan debt.  From 1989 to 2007, her higher education and living expenses were funded through student loans and disability payments.  Notwithstanding the good intentions of all involved, Ms. Todd's and the DOE's collaborative mission to integrate her into the work force turned out to be a lost cause (outside of its purely academic benefits) due to her Autism and its utter negation of her ability to ever hold down a real job that paid significant wages.

    *d.*    *Ms. Todd's Employment History*

Ms. Todd has only been employed for a single, brief period in her life.  From 1999-2003, she worked as an adjunct professor at these West Virginia institutions: Fairmount College, West Virginia University and Marshall University.  She taught only one two-credit course per semester and never worked more than two semesters in a given year. While teaching she continued her own course of study, taking classes at Regent.  She had to begin preparing three days in advance to be ready to teach a single class session.  She was a contract employee and was paid a meager total of $1,200 for each semester (representing payment for teaching one class) that she taught.

---

[14] While reflecting upon the unusual facts of this case, questions about the qualitative value of the courses pursued by Ms. Todd have arisen in the Court's mind, especially how they might compare to a standard academic experience.  No evidence was submitted as to the relative rigor of any of the individual courses and that probably would have amounted to more trouble than it was worth if not an outright waste of time.  Yet, it is certain that however demanding her classroom experience was, Ms. Todd had the benefit of significant accommodations and the DOE's enforcement power behind her as she made her way through school.

HUD provided a subsidized housing arrangement for Ms. Todd while she taught.[15] She is convinced that it was the housing arrangement which made it possible for her to work. Then, in 2007, according to Ms. Todd, she had to leave her West Virginia abode because the coal mine underneath it became volatile. She returned to Baltimore and has not been employed since. Nor has she resided in a HUD-backed subsidized housing arrangement like the one she benefitted from in West Virginia.

### B. Ms. Todd's Student Loan Debt

During her nearly twenty years of education, Ms. Todd's debt burden ballooned to $339,361.68. The loans are held by the Defendants (a) AGI, a non-profit organization specializing in graduate student loans, (b) ECMC, the assignee of several loans from Sallie Mae, Inc. and AGI, and (c) DOE. AGI granted three private loans to Ms. Todd in 2004, 2005 and 2006 in the original principal amounts of $28,835.00, $28,835.00, and $37,031.00, respectively. With accrued interest and other fees, the total indebtedness due AGI as of November 17, 2010 was $125,581.32. ECMC was assigned eighteen loans that Ms. Todd received from 1989 through 2007. As of November 10, 2010, the balance, including interest and fees, due ECMC was $132,912.77 with interest continuing to accrue at variable rates ranging from 2.47% to 3.54% *per annum*. The total amount due DOE as of that date was $80,867.66, including $62,530.37 in principal and $18,337.29 in interest.[16]

---

[15] Ms. Todd testified that the housing was designed to help people with disabilities live more independently and that her mortgage payment was zero. (Todd Dep. 44, 52-53.)

[16] At trial, the Defendants called no witnesses and relied only upon their exhibits and the cross-examination of Ms. Todd. Thus, there was no evidence as to what, if any, vetting process was employed by the lenders to determine the likelihood of repayment before the loans were granted to Ms. Todd. This was entirely appropriate as creditor reliance is not a material issue under Section 523(a)(8). As was observed by the District Court in *In re Brunner*, 46 B.R. 752, 756 (D.C.SD.N.Y. 1985), "[The government] offers loans at a fixed rate of interest, and it does so almost without regard for creditworthiness." The ease with which student loans are granted reflects a congressional choice decidedly in favor of higher education and America's future. The check on abuse is the difficulty with which they

Ms. Todd claimed that she made payments on her AGI loans while attending school. However, she could remember neither the dates nor amounts of any payments and did not have any documentation to confirm her recollection. None of the Defendants' exhibits reflect any payments. However, Ms. Todd applied for, and was granted, deferrals on the DOE loans such that, at the time of trial, they had yet to come due.[17]

Ms. Todd was offered loan consolidation and adjusted repayment plans by ECMC and DOE but chose not to accept either option. She appears to be eligible for participation in the William D. Ford Direct Loans Program (Ford Program) and its well known Income Contingent Repayment Plan (ICRP). Ms. Todd acknowledged her awareness of the Ford Program and seemed to understand that, if approved, her monthly 'payment' under the ICRP (determined by her income and its relationship to the federal poverty guidelines) would likely be $0.00, and would remain at $0.00 if her income did not increase. See 34 C.F.R. § 685.209. It was indicated that after 300 months, and barring a material upward change in her financial circumstances, the loans would be forgiven. *Id.* The AGI loans, as private lender loans, are not eligible for the Ford Program, and in any event, there was no evidence that any like program was ever formally offered by AGI to Ms. Todd, although AGI's counsel suggested during oral argument that such a resolution could be arranged. Nevertheless, Ms. Todd turned down the ICRP option and explained why. She testified that based upon information she gleaned from the Internet, ICRP

---

can be discharged in bankruptcy. Yet, in hindsight, it is evident that some level of heightened scrutiny on the front end would have been prudent with respect to Ms. Todd's loans.

[17] Ms. Todd's written deferment requests were all directed to DOE, presumably for DOE-held loans. However, as some of Ms. Todd's loans have been assigned, it is unclear who currently holds the deferred loans.

was only another form of 'predatory lending' that she was firmly convinced would only worsen her situation.[18]

## IV. <u>Jurisdiction and Venue</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334, 157 and Local Rule 402 of the United States District Court for the District of Maryland.  Venue is likewise proper under 28 U.S.C. §1409(a).

## V. <u>Analysis</u>

### A. *Legal Standard*

Student loan debt is generally excepted from an individual's Chapter 7 discharge "unless excepting such debt from discharge under this section would impose an undue hardship on the debtor and the debtor's dependents[.]"  Section 523(a)(8).  The phrase 'undue hardship' is undefined in the Bankruptcy Code.  However, in *Educ. Credit Mgmt. Corp. v. Frushour*, 433 F.3d 393, 400 (4th Cir. 2005), the Fourth Circuit adopted the three-part test enunciated in *Brunner v. New York State Higher Educ. Servs., Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) for determining whether a debtor's repayment of a student loan will constitute an undue hardship. Under *Brunner*, it must be established:

> (1) That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> (2) That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> (3) That the debtor has made good faith efforts to repay the loans.

---

[18] The Court of course does not believe that the ICRP program engages in 'predatory lending' but does believe that Ms. Todd is positive that is the case.

15

*Brunner*, 831 F.2d at 396. Ms. Todd has the burden of proving all three factors by a preponderance of the evidence. *Frushour*, 433 F.3d at 400.

The undue hardship standard is intended to safeguard the student loan program from abusive borrowers. *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1306 (10th Cir. 2004) ("In enacting §523(a)(8), Congress was primarily concerned about abusive student debtors and protecting the solvency of student loan programs."); *In re Brunner*, 46 B.R. at 755 ("The propriety of a requirement of good faith is further emphasized by the stated purpose for §523(a)(8): to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed these loans.") (citing Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93-137, Pt. I, 93 Cong., 1st Sess. (1973) at 140 n. 14, *reprinted in Collier on Bankruptcy*, Appendix 2, PI-I (15th ed. 1979)).

### B. Whether Ms. Todd can Maintain a Minimal Standard of Living if Forced to Repay the Loans

In order to determine if a debtor can maintain a minimal standard of living while repaying student loans, the bankruptcy court "must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing and medical treatment are met" and then determine if, at the debtor's current income, any funds are left for payment of student loans. *In re Burton*, 339 B.R. 856, 870 (Bankr.E.D.Va. 2006), (citing *In re Salinas*, 240 B.R. 305, 314 (Bankr.W.D.Wis. 1999)). If a debtor's reasonable monthly expenses equal or exceed her income then the Court may safely conclude that part one of the *Brunner* test has been satisfied. *In re Ammirati*, 187 B.R. 902, 907 (D.S.C. 1995), *aff'd*, 85 F.3d 615 (4th Cir. 1996). Even if, at the time of trial, a debtor has not minimized all her expenses, she may still

16

satisfy this standard if, after expenses are minimized, her expenses would still equal or exceed income. *Id.*

Ms. Todd has been unemployed since 2003 and never had a job until 1999 when she was approximately 51 years old. Her total monthly income is $768 in SSDI payments and that is supplemented by $200 in food stamps. With $1,906.00 per month in expenditures on housing, food, clothing, transportation, medicine and other necessities, Ms. Todd has an ongoing monthly deficit of $938, roughly equal to her monthly, food stamp-aided income. Her entire ability to fight on and manage expenses over and above her SSDI payments and food stamps derives from her tenacious efforts at finding charity. The evidence convincingly confirms that this particular brand of tenacity is regularly required.

Respondent ECMC argues, however, that Ms. Todd could further minimize her expenses in three ways: 1) eliminate her telephone expense of forty-nine dollars per month, 2) reduce her monthly rent expenditure of $1,050 by either renting a smaller apartment or renting out a room in her current apartment and 3) reduce her monthly food expenditures of $425. Considering the fact that Ms. Todd has no other expenses for telecommunications, including none purely for entertainment, this Court finds that the expenditure of $49 per month on telephone service is reasonable.[19] See e.g. *Frushour*, 433 F.3d at 400 ("ECMC is mistaken to suggest that having internet and cable connections requires the conclusion that Frushour maintains more than a 'minimal' standard of living."). The Court finds likewise with respect to her food expenditure of $425. With today's economy as the backdrop, and with deference to local community standards,

---

[19] Ms. Todd testified that at one point in her past her Internet service was 'subsidized'. Although Debtor's Schedule J listed $49 for "telephone" expenses, Ms. Todd stated in her deposition that she pays approximately $50 per month for a combined package, including cable and Internet, from Comcast. (Todd Dep. 13-14.) Presumably this $49 figure represents that combined package. The Court is unsure whether her subsidy was in effect at the time she filed bankruptcy but that would appear to be the case.

the Court concludes that both expenditures are well within a minimal standard of living especially in the overall context of Ms. Todd's simple, frugal lifestyle and, moreover, her eligibility for, and use of, food stamps. While this Court agrees that Ms. Todd's rent expense for a two bedroom apartment is relatively high, the fact is at the time of trial she did not have the means to regularly pay it and consistently relied upon charity to avoid eviction.

No evidence was submitted by the Defendants to demonstrate how Ms. Todd could reasonably and effectively pare down her expenses to negate her monthly deficit of $938 *and* free up enough cash to afford regular, meaningful payments toward her student loan debt. If, for example, Ms. Todd were to reduce her monthly food expense to $200 (her food stamp allotment), cut her rent in half by sharing her apartment with a roommate and eliminate her telecommunications expense, she would save $799 per month. This would still result in a monthly deficit of $139 and would not result in the availability of any additional funds for payment of the student loans. Worse, in all likelihood, it would lead to near, or likely, starvation.

The student loans total nearly $340,000 with interest continuing to accrue. Even if her expenses were minimized, Ms. Todd's current income would not allow her to maintain a minimal standard of living and repay, or even put a dent in, the total sum outstanding. Ms. Todd therefore satisfies the first prong of the *Brunner* test.

### C. *Whether Additional Circumstances Exist to Establish that this State of Affairs is likely to Persist for a Significant Portion of the Repayment Period of the Student Loans*

The second prong has been described as the 'heart' of the *Brunner* test. *Frushour*, 433 F.3d at 401. The Fourth Circuit characterizes it as "a demanding requirement." *Id.* (quoting *Brightful v. Pa. Higher Educ. Assistance Agency*, 267 F.3d 324, 328 (3d Cir. 2001)). In order for a debtor to meet this standard, it must be found that a "certainty of hopelessness" exists that the

debtor will not be able to repay the student loans.  *Id.* As described in the case law, some of the

circumstances that might underlie a certainty of hopelessness are "illness, disability, a lack of

usable job skills, or the existence of a large number of dependents." *Id.* (quoting *Oyler v. Educ.*

*Credit Mgmt. Corp.*, 397 F.3d 382, 386 (6th Cir. 2005)). In *Frushour,* the Fourth Circuit

acknowledged by implication that advanced age and mental disabilities might constitute the type

of "special circumstances" that will satisfy the second *Brunner* factor.  433 F.3d at 401.  (The

court noted that the debtor was in her forties and without physical or mental disabilities, so she

did not have the requisite additional circumstances to meet the second factor.).

In the case at bar, the fundamental premise underlying Ms. Todd's position is that her

Autism, PTSD, osteoporosis, lack of usable job skills and age combine to overwhelmingly create

additional circumstances that will prevent her from ever raising her standard of living above the

subsistence level during the repayment period.  Of those circumstances, the Court finds that Ms.

Todd's Autism is by far the most compelling.

*In re Doherty*, 219 B.R. 665 (Bankr. W.D.N.Y. 1998) posits vigorous reasoning with

respect to the significance of mental and emotional disabilities in the context of student loan

dischargeability. In that case, the Court determined that the first and second *Brunner* factors

would be fulfilled if the debtor:

> provide[s] undisputed evidence that they suffer from a presently
> incurable impairment of emotional or mental functioning that is:
>
> 1)      Recognized by the mainstream of medical
> professionals to be of bioneurological, physiological or of other
> pathological or organic origin (as opposed to a matter of volition);
> and
>
> 2)      Proven to be the cause of a particular debtor's
> present inability to maintain a minimal standard of living for
> herself or her dependents if forced to repay the loans, regardless of
> whether

3)
      a.     The disease is being properly treated, but nonetheless causes such inability, or
      b.     The debtor's failure to receive proper treatment is either part of the disease or is otherwise excusable.

*Id.* at 667.

The foregoing standard is a stringent one and appears well designed to filter out all but the most serious and convincing 'additional circumstances' grounded in a bioneurological source. The evidence overwhelmingly supports the conclusion that Ms. Todd's Autism satisfies the *Doherty* test. However, the companion formulation enunciated in that case – that it be 'reasonably likely' that a debtor's mental illness and resulting inability to pay will continue for the long term – is a significantly lesser one than a 'certainty of hopelessness'. *Id.* at 671 (arguing that *Brunner* requires a 'reasonably likely' standard instead of one based upon a 'certainty of hopelessness'). The Fourth Circuit has made it clear that the 'certainty of hopelessness' standard governs in this District and hence in Ms. Todd's case. See *Frushour*, 433 F.3d at 401; *In re Spence*, 541 F.3d 538, 544 (4th Cir. 2008).

But the facts need not be forced to fit the standard. According to Dr. Gopalan, (1) Ms. Todd's Autism is incurable and untreatable and (2) it will prevent her from ever finding normal employment. His opinion is borne out by both Ms. Todd's life history with Autism and her condition at the time of trial. With Ms. Todd's circumstances, a certainty of hopelessness is easily found.

Dr. Gopalan's testimony in this regard is particularly definitive on two broad fronts. It was his opinion that Ms. Todd will never be able to, "work and pursue a job, pursue a profession and pursue financial income through employment as we customarily know what employment is.

She's not able to do that." (Gopalan Dep., 21.) Moreover, Dr. Gopalan also opined on the degree

to which Ms. Todd's performance in an academic setting had any relevance to her ability to

work. In that context, Dr. Gopalan gave the following testimony:

> Q – When you were asked by Mr. Gordon about the ability of her today to go to work, you said that any type of work would need to be very closely monitored or supervised?[20]

> A – Exactly.

> Q – Would you say that would be the same with her schooling?

> A – It might be the same. It might be different. Asperger's syndrome, those people will pick a topic and become very focused and very educated about that topic…let's say in art. She can become very good with that and stay focused on the course, but if you threw some calculus in there she may not be interested in it at all and have great difficulty processing that information. It may be qualitative or quantitative but she will pick a topic and be very focused on that, but anything else they wouldn't be able to focus on.

>                    *              *              *

> Q – Now, if I told you that she was able to successfully obtain two different master's degrees, would you say that's consistent with your understanding of her capacity to focus?

> A – Yes, that is consistent with my understanding of her capacity to focus.

> Q – Consistent or inconsistent?

> A – It is consistent with my understanding of her capacity to focus…Ms. Carol Todd came back from West Virginia and said she had a Ph.D in women's study or something like that. I found that is possible…it is possible for her to get a Ph.D. That's my understanding of Asperger's.

> Q – Then wouldn't it be possible for her to work in the area in which she obtained her Ph.D, her master's degree?

---

[20] The DOE was represented by Alex Gordon.  He is no relation to this Opinion's author.

A – It may be possible for her to work in the area of woman's studies, but part [sic] is her ability to be a productive employee which is extremely limited. Her ability to be a productive student is not limited.

(Gopalan Dep., 41-43.) (Parentheses added.) [21]

In other words, the fact that the strange vagaries of Autism permitted Ms. Todd to make her way – with regular accommodations and the DOE often coming to her defense – through several educational settings with apparent success does not equate with an ability to hold down a job and earn a living.  The Defendants point to Ms. Todd's educational achievements and brief employment as an adjunct professor and claim them as proof of her potential to get employment, increase her income and repay her student loans.  However, and especially in light of Doctor Gopalan's observations, the Court concludes that those experiences are proof of nothing more than the mystery that is Autism and,  moreover, unique, non-transferable circumstances.  While Ms. Todd can focus with intensity academically, Autism will not allow her to function in a normal job setting and generate meaningful income. Autism narrows Ms. Todd's focus to a microscopic pinpoint, impairing considerably her ability to effectively interact with people, places and things. That might be the recipe for a perfect student but also an unemployable citizen, as we see with Ms. Todd.[22]

---

[21] As pointed out by Judge St. John *In re Burton*, 339 B.R. 856 (Bankr. E.D.Va 2006) it is a rare thing for a debtor who seeks the discharge of student loan to have the means to afford an expert medical professional to testify on her behalf.  See *Id.* at 874-81 (discusses at length the issue of expert testimony regarding mental illness in bankruptcy cases).Without that testimony, Judge St. John was unable to satisfy himself as to the root cause – mental illness or simple unwillingness – of the mentally ill debtor's inability to find employment.  Here, Ms. Todd's own materially undisputed testimony is compelling enough.  However, to have the thoroughly objective and credible input of Dr. Gopalan layered on top of her testimony raises the weight and substance of the evidence to the clearly convincing level.

[22] *In re Reynolds*, 303 B.R. 823 (Bankr.D.Minn. 2004) involved a mentally ill debtor who attended school, and passed the bar examination but could not get a job as a lawyer.  The bankruptcy court did not apply the *Brunner* test. However, the Court did make the following cogent observation that is particularly apt with respect to Ms. Todd's circumstances:

The only employment Ms. Todd has ever had was in an academic setting. It is not hard to imagine her using the same skills that allowed her to successfully complete courses of study to briefly function as a teacher albeit with significant accommodations and limitations.  All told, she taught courses limited to only two-credits per semester at community colleges and was unable to teach year round.  It took Ms. Todd three days to prepare to teach a single class and her total compensation was only $1,200 a semester per class.  And her testimony went unrebutted that this brief arrangement was only realized by her HUD sponsored supportive housing arrangement.  Obtaining similar employment at the same pay rate, if possible, might fleetingly alleviate some of Ms. Todd's financial distress, but it would not put her in a position to either maintain a minimal standard of living while making student loan payments or pay any appreciable amount of money to the Defendants.

Ms. Todd's poignantly futile, but well intended, efforts to actually secure employment are also compelling on this point.  She testified to thirteen to fifteen hour long sessions each day devoted to contacting church pastors and begging for work.  She said she would,

> Tell them a very brief account of my story about moving back to Maryland.  And, you know, just in desperate financial straits. And…need help and then asking for work…offering to do their

---

On the one hand, she clearly is a person of substantial natural intelligence.  This is recognized as such by the mental health professionals who have treated or evaluated her, and is evidenced by her achievement in the controlled environment of academia.  On the other hand, in a non-academic environment her conditions of depression and anxiety work, synergistically or individually, to deprive her of the ability to analyze problems and to make decisions and judgments for the benefit of third parties with the certainty and confidence that are required of an attorney and fiduciary.  She is unable to consistently focus on more complex problems over an extended period of time.

*Id.* at 831.

gardening, their landscaping or cleaning their church or anything to
get money to my landlord.[23]
(Todd Dep., 35.)

Ms. Todd has shown clearly and convincingly that her Autism, age and other ailments

are, in combination, special circumstances that create a certainty of hopelessness that she will

ever obtain employment sufficient to allow her to both maintain a minimal standard of living and

repay her student loans.  Likewise, and perhaps more to the point as far as legislative intent goes,

she is the antithesis of an abusive borrower. Therefore, she has met and exceeded the second

*Brunner* factor.

### D.  Whether the Debtor had Made a Good Faith Effort to Repay the Loan

The good faith analysis looks specifically at the "debtor's efforts to obtain employment,

maximize income and minimize expenses." *Frushour*, 433 F.3d at 402.  By looking at these

factors, a court may determine whether "the debtor's hardship is a result of factors over which

she has no control."  *Id.*

---

[23] To this Judge, the cross-examination of Ms. Todd during her deposition often recalled the lyrics of *Hello Goodbye*.

> *You say "yes", I say "No".*
> *You say "Stop" and I say "Go, go, go".*
> *Oh no.*
> *You say "Goodbye" and I say "Hello, hello, hello".*
> *I don't know why you say "Goodbye", I say "Hello, hello, hello".*
> *I don't know why you say goodbye, I say hello.*
> \*        \*        \*
> *I say "High", you say "Low".*
> *You say "Why?" and I say "I don't know".*
> *Oh no.*
> *You say "Goodbye" and I say "Hello, hello, hello".*
> *I don't know why you say "Goodbye", I say "Hello, hello, hello".*

The Beatles, *Hello, Goodbye, on Magical Mystery Tour* (EMI Records 1987) (1967).  In short, there was no common point of reference.  While defense Counsel sought to logically establish that Ms. Todd had not either conventionally and/or effectively pursued employment opportunities, her responses made it clear that such an effort would be as unmanageable for her as it was for Alice to successfully pass the Red and White Queens' interrogation. Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* 285-90 (Puffin Books 1998) (1871).  Filing out an employment application, scouring the want-ads for work, or showing up on the unemployment line are not things Ms. Todd can do to achieve any practical benefit, commonly understood.

The Circuit Court decided *Brunner* upon the basis of the second, "additional circumstances" factor.  The Court did not tarry over either the District Court's reasons for including the good faith test or its analysis of Ms. Brunner's good faith.  Prior to the appeal however, District Court Judge Haight explained the policy reasons underpinning the inclusion of a good faith inquiry in the undue hardship analysis:

> There is no specific authority for this [good faith] requirement, but the need for some showing of this type may be inferred from comments of the Commission report. In discussing the discharge of loans after five years,[24] when a showing of undue hardship is no longer required, the Commission noted that such *discharge is fair because the debtor may be unable to repay his or her debts due to "factors beyond his reasonable control."*  Report of the Commission on the Bankruptcy Laws, *supra*.
>
> *          *          *
>
> The propriety of a requirement of good faith is further emphasized by the stated purpose for § 523(a)(8): to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed these loans. *Id.* at 140, n. 14. Thus it is proper to require a debtor to show that he or she has made good faith efforts to repay the loan and that *the forces preventing repayment are truly beyond his or her reasonable control*.

*In re Brunner*, 46 B.R. 752, 755-56 (S.D.N.Y. 1985), *aff'd sub nom., Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2nd Cir. 1987). (parenthesis and emphasis added.)

The significant question ─ the one that encapsulates the legislative focus ─ is therefore whether factors beyond the debtor's control have resulted in an inability to pay the student loan. Here, the Defendants rely upon Ms. Todd's history of non-payment and refusal to enter into an ICRP as irrefutable evidence of her lack of good faith.  This Court concludes, however, that such

---

[24] A previous version of Section 523(a)(8) of the Code allowed student loans to be discharged either upon showing of undue hardship or, once five years had elapsed, for no reason at all.  In 1990, the time period was extended to seven years.  104 Stat 4789.  The seven-year measuring stick was eliminated by the Higher Education Amendments of 1998 and undue hardship became the sole standard.  112 Stat 1581.  According to the House Conference Report, this was done to ensure the budget neutrality of the Higher Education Amendments of 1998.  H.R. Conf. Rep. 105-750 (1998).

an analysis is much too simplistic in light of the unusual and compelling circumstances presented by this case and how they compare to the anti-abuse policy behind the statute.

    *1.  Non-Payment*

    Whether Ms. Todd has ever made any payments on any of these loans is unclear. What is clear though is that she has not made any regular payments to the Defendants and admits to making no payments on many of the loans.  However, "the failure to make a payment, standing alone, does not establish a lack of good faith."  *Polleys*, 356 F.3d at 1311; see also *Burton*, 339 B.R. at 884 ("Courts have long recognized that a truly impoverished debtor cannot be considered acting in bad faith for not paying his loans if he clearly does not have the money to do so.").

    In short, Ms. Todd testified that she has failed to make payments because she has never been able to afford them.  This Court believes her. Her income, expenses and employment history have already been addressed at length and, all in all, they present a dismal financial picture.  The Defendants submitted no evidence to show that Ms. Todd has ever had enough income to provide for more than a minimal standard of living.  There is certainly no evidence that she has ever had the financial wherewithal to both maintain a minimal standard of living and repay, or even make meaningful payments, on her student loans.  The cause behind this is, of course, Ms. Todd's Autism and its negation of her ability to be employed.

    The argument is made, however, that the true root cause behind Ms. Todd's lack of employment is her muddled, and otherwise ineffective, job search effort.  Indeed, it is suggested that Ms. Todd has never really tried to get a job.  This Court, however, has concluded that the deficiencies in Ms. Todd's job search are a product of her Autism: her ailment simply will not allow her to manage a job hunt as if she was un-afflicted.  And even if she could diligently scour job listings and prepare applications, it is abundantly clear that her Autism will block her from

attaining any sort of gainful employment. The fact that Ms. Todd neither applied for jobs she could not perform, nor obtained jobs for which she applied, does not show that she failed to act in good faith.[25]  In her own touching way, Ms. Todd has tried to get a job. The fact that she hasn't had one either before or after her foray into teaching is simply a reflection of the limitations placed on her by Autism.

Because Ms. Todd's ability to secure employment is outside of her control, this case is readily distinguished from those where good faith was found wanting by the Fourth Circuit.  In *Frushour* the debtor chose to take a lower-paying job in a field she preferred, despite a proven ability to obtain more lucrative employment. 433 F.3d at 401.  Ms. Todd's 'freedom of choice', such as it is, has played no role in her unemployment.   In *In re Spence*, a highly educated debtor in her late sixties made a decision to work at a low-paying job.  541 F.3d at 544.   That debtor, however, had a prior history of regular employment and had not searched for a higher paying job for some time.  *Id*.  Moreover, Ms. Spence did not suffer from the crippling effects of Autism.

Amongst the circuit courts that rely upon *Brunner*, *Polleys* is a reported opinion with facts very similar to Ms. Todd's case.[26]  There, a debtor with a degree in accounting was severely hampered in her ability to obtain employment due to mental illness and had never made a single payment on her student loans.  *Polleys*, 356 F.3d at 1305.  The Tenth Circuit stated that "[i]t is

---

[25] By 'applied', the Court is referring to her marathon Internet and 'cold call' sessions directed mainly at churches and autism centered organizations.  Ms. Todd also testified to her failed attempt to find work through the government's 'Ticket to Work' program.  She summed-up her dilemma this way:

> I wish somebody would give me work but I don't know how to get it.
> People with my shortcomings can't get work and if I do find work
> they'd have to customize it to me just the way those ─ you know the
> government spends a lot of money on customized work situations for
> individuals with autism.  But the funding's gone.  (Trial Tr., 34, Nov.
> 22, 2010.)

[26] In *Polleys*, the Tenth Circuit adopted the *Brunner* test, albeit a decidedly less stringent version than that adopted in this Circuit.

clear that Ms. Polleys has been trying her best in good faith to become financially independent, but that circumstances beyond her control are keeping her from reaching that goal." *Id*. at 1312. Ms. Polleys' student loans were properly discharged. *Id*. Ms. Todd's Autism, a circumstance beyond her control, has prevented her from becoming employable and achieving the financial stability she seems to sincerely desire.  Her failure to pay therefore in no way demonstrates a lack of good faith but only confirms Autism's cruel power.

    2.  *Failure to agree to an ICRP*

    Normally, another important element of the good faith inquiry is whether a debtor has sought out and seriously considered loan consolidation options that might make her debt less onerous.  *Frushour*, 433 F.3d at 402. Pursuit of loan consolidation options might show whether a debtor "takes her loan obligations seriously, and is doing her utmost to repay them despite her unfortunate circumstances."  *Id*.  However, the failure to agree to an ICRP is not always dispositive.  *Id*.  The Court does not believe it should be dispositive here.

    This is not a case of a debtor who has sought to abuse either the student loan regime or the bankruptcy process.  Ms. Todd is not consciously shirking her responsibility by choosing to work at a lesser paying job than her education permits, or, intentionally remaining unemployed. To the contrary, she is permanently unemployable and, barring a miracle, her financial situation will not change.  To hold that good faith will only be found if she agrees to a repayment program that will not require her to make any payments -- $0.0 'monthly payments' for twenty-five years ─ would be the height of Kafka-esque logic.  This Court will not embrace that sort of thinking.

    Section 523(a)(8) allows debtors to discharge their student loans upon a showing that repaying them would be an "undue hardship."  There is no indication that Congress intended to supplant this unambiguous directive with the Ford Program and its existence should not be

treated as an implicit repeal of Section 523(a)(8). See 4 *Collier on Bankruptcy*, ¶523.14[2] (16th ed. 2012). While the Ford Program does allow debtors with real prospects for future financial improvement to reasonably manage their student loan obligations during hard times, for Ms. Todd and the Defendants it serves no practical purpose.[27] Even if Ms. Todd was able to obtain another teaching appointment like those she previously held, it would, at best, serve as a relatively meaningless band-aid and would not enable her to make meaningful payments under the Ford Program.[28]

Finally we address Ms. Todd's stated reason for refusing to take advantage of the Ford Program, namely that the ICRP is an example of 'predatory lending'. While this Court does not believe that the ICRP is a predatory lending scheme, this Court does believe that Ms. Todd is convinced of this based upon her processing of information derived from the Internet. Accordingly, her refusal to participate in the Ford Program does not arise from a lack of a desire to repay her loans and is not fatal to her cause of action. It is merely one more manifestation of her Autism.

## IV.  <u>Conclusion</u>

Because the repayment by Ms. Todd of her student loans would be an undue hardship, they will be included in her general discharge. A separate order memorializing that result shall issue.

---

[27] The Court reiterates that the AGI loans are not eligible for the Ford Program and Ms. Todd's good faith with respect to these loans cannot be measured by her willingness to agree to a deferment, consolidation or income contingent repayment plan.

[28] Participation in the Ford Program could also have serious tax consequences for Ms. Todd that would negate the program's superficial solution. This is so because the tax code provides that income includes "income from discharge of debt." 26 U.S.C.A. §61(a)(12) (West, 2012). While some types of discharge of student loan debt are exempted from inclusion in income, debt discharged under an ICRP is not. 26 U.S.C.A. §108(f)(1) (West, 2012).